**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY GAENZLE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| | : | |
| SYNAPSE MARKETING SOLUTIONS, | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Anthony Gaenzle, by and through his undersigned counsel, The Lacy Employment Law Firm, LLC, files this Complaint against Defendant Synapse Marketing Solutions and avers as follows:

## NATURE OF THE ACTION

1. This is an action for unlawful retaliation, age discrimination, disability discrimination, hostile work environment, and failure to accommodate. Plaintiff Anthony Gaenzle brings claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*; the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101, *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq*.

2. After Plaintiff led a group of colleagues in a good-faith complaint about the workplace misconduct of Brian Brinkley, Synapse responded not by addressing the complaint, but by elevating Mr. Brinkley to a supervisory position over Plaintiff and arming him with the authority to retaliate. Synapse thereafter subjected Plaintiff to escalating adverse treatment,

1

stripped him of his duties and reassigned them to substantially younger employees, demoted him and cut his pay, denied his request for a disability accommodation that it freely granted to younger employees, and ultimately terminated him.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343, as the action arises under the ADEA and the ADA.

4.    This Court has supplemental jurisdiction over Plaintiff's state-law PHRA claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same common nucleus of operative facts as Plaintiff's federal claims and form part of the same case or controversy.

5.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District. Defendant maintains its place of business in Lancaster, Pennsylvania, and the unlawful employment practices alleged herein were committed within this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.    On or about February 25, 2025, Plaintiff timely dual-filed a Charge of Discrimination with the Philadelphia District Office of the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") and filed an Amended Charge of Discrimination on or about March 13, 2025, alleging retaliation and discrimination on the basis of age and disability. The Charge was assigned EEOC Charge No. 530-2025-04052.

2

7.      Plaintiff's Charge was cross-filed with the PHRC, thereby satisfying the dual-filing requirement of the PHRA. More than one year has elapsed since the filing of the Charge with the PHRC.

8.      On May 22, 2026, the EEOC issued Plaintiff a Notice of Right to Sue with respect to EEOC Charge No. 530-2025-04052. A true and correct copy of the Notice of Right to Sue is attached hereto as **Exhibit 1** and incorporated by reference.

9.      Plaintiff has filed this Complaint within ninety (90) days of his receipt of the Notice of Right to Sue.

10.     Plaintiff has fully complied with, and exhausted, all administrative prerequisites to the commencement of this action.

**PARTIES**

11.     Plaintiff Anthony Gaenzle ("Plaintiff" or "Mr. Gaenzle") is an adult individual residing at 383 Cobblestone Lane, Lancaster, Pennsylvania 17601. At all relevant times, Plaintiff was employed by Defendant and was an "employee" within the meaning of the ADEA, the ADA, and the PHRA.

12.     Defendant Synapse Marketing Solutions ("Defendant" or "Synapse") is a marketing agency with its principal place of business located at 2950 Old Tree Lane, Lancaster, Pennsylvania 17601. At all relevant times, Synapse was an "employer" within the meaning of the ADEA, the ADA, and the PHRA, and employed the requisite number of employees to be subject to each statute.

13.     At all relevant times, Synapse acted through its officers, managers, agents, and employees, including its Chief Executive Officer, Robert ("Bobby") Deraco, and its Chief

3

Operating Officer, Brian Brinkley, each of whom acted within the scope of his authority and on behalf of Synapse.

## FACTUAL BACKGROUND

14. Prior to joining Synapse, Plaintiff owned and operated his own marketing agency for approximately three years, where he maintained his own client relationships.

15. Synapse approached Plaintiff and recruited him to leave his agency and join Synapse, promising that he would receive a substantial salary, lucrative commissions of up to $100,000, his own office, and the opportunity to bring his existing clients to Synapse over time.

16. In reliance on these representations, Plaintiff accepted employment with Synapse and began work on or about February 19, 2024, as Vice President of Strategy and Content, at a starting salary of $130,000 per year.

17. As Vice President of Strategy and Content, Plaintiff led Synapse's marketing strategy and content team, developed and executed marketing strategies for clients, ran marketing campaigns, and managed website projects, among other responsibilities.

18. Plaintiff performed his job well. Synapse's Chief Executive Officer, Bobby Deraco, repeatedly praised Plaintiff, stating on numerous occasions that Plaintiff had turned his department around and that the quality of Plaintiff's work exceeded Mr. Deraco's own. Plaintiff was consistently praised in leadership meetings throughout the early months of his employment.

19. In reliance on Synapse's promises, Plaintiff brought two of his own clients to Synapse, together worth approximately $110,000 in annual revenue.

20. In or about April 2024, shortly after beginning his employment, Plaintiff led a group of his colleagues in raising a good-faith complaint to Synapse's leadership regarding the

workplace conduct and performance of Brian Brinkley, who was then engaged by Synapse as a part-time consultant performing human resources functions.

21.    Plaintiff and his colleagues complained that Mr. Brinkley rarely performed his own work, improperly shifted his responsibilities onto other employees, failed to complete or even begin numerous projects, and impeded the ability of others to perform their jobs.

22.    As a result of the complaint that Plaintiff led, Mr. Brinkley was nearly terminated. Synapse assured Plaintiff and his colleagues that it would address the concerns they raised.

**C. Synapse Promotes the Subject of the Complaint and Empowers Him to Retaliate.**

23.    Synapse did not address Plaintiff's complaint. Synapse never conducted any documented investigation into the complaint.

24.    Instead, within a short time of the complaint, Synapse promoted Mr. Brinkley - the very subject of the complaint - to the position of Chief Operating Officer, making him a supervisor over Plaintiff, while Mr. Brinkley simultaneously retained his role as Synapse's sole human-resources contact.

25.    Mr. Brinkley soon learned that Plaintiff had led the complaint against him. From that point forward, Mr. Brinkley made it his mission to retaliate against Plaintiff and to force him out of the company.

26.    Because Mr. Brinkley served as Synapse's only human-resources representative, Plaintiff had no one within the organization to whom he could report Mr. Brinkley's retaliatory conduct.

27.    After learning of Plaintiff's protected activity, Mr. Brinkley and Synapse subjected Plaintiff to severe and pervasive hostile treatment, including the following:

5

28.    Surveillance. Synapse had Plaintiff watched and had individuals monitor and report on him to Mr. Brinkley. If Plaintiff left the office for as little as thirty minutes, he received emails demanding to know where he was going - scrutiny to which no other employee was subjected.

29.    Disparate scheduling requirements. While other employees were permitted to arrive at work between approximately 8:45 a.m. and 9:30 a.m., Mr. Brinkley required Plaintiff alone to arrive by 8:00 a.m., and then criticized Plaintiff for his arrival time even as other employees routinely arrived later.

30.    Disparate work assignments. Plaintiff was directed to complete tasks that were outside his job description and that no other employee was required to perform.

31.    Mr. Brinkley further blamed Plaintiff for problems that were not his fault, turned colleagues against him, and cultivated an atmosphere in which Plaintiff could not speak freely about Mr. Brinkley's conduct without fear of further reprisal.

32.    As a direct result of this sustained hostile treatment, Plaintiff's mental health deteriorated, and he developed and suffered from severe anxiety.

33.    Beginning in or about the summer of 2024, Synapse quietly reduced Plaintiff's responsibilities and reassigned his duties to substantially younger, less experienced employees. Plaintiff, who was 46 years old, was systematically moved out of roles of responsibility while younger employees were elevated.

34.    On or about September 2024, Mr. Brinkley summoned Plaintiff into his office and, without any prior warning, placed Plaintiff on a Performance Improvement Plan ("PIP"). The purported performance issues cited in the PIP had never previously been raised with Plaintiff and were vague, inconsistent, and lacking measurable benchmarks.

35.     The PIP nominally afforded Plaintiff four weeks to address the purported concerns. After only approximately three weeks, however, Synapse informed Plaintiff that "it wasn't working out," demoted him, and cut his annual pay by approximately $30,000.

36.     In connection with the demotion, Synapse changed Plaintiff's job title from Vice President of Strategy and Content to Lead Strategist, without warning or legitimate reason, and reduced his duties and responsibilities.

37.     The responsibilities that Synapse stripped from Plaintiff to justify the demotion were reassigned to substantially younger employees. No younger employee was placed on a PIP, demoted, or stripped of title or pay for similar or lesser conduct.

38.     Synapse also failed to honor the financial promises it made to recruit Plaintiff. Despite promising commissions of up to $100,000 and his own office, Synapse paid Plaintiff only approximately $6,000 in commissions over nine months - and even then only after Plaintiff was forced to fight for it - and never provided the promised office.

39.     In or about November 2024, as a result of the worsening anxiety caused by the hostile work environment, Plaintiff requested permission to work from home - an arrangement that many of his colleagues were permitted to enjoy in their respective roles.

40.     Rather than engage with Plaintiff's request, Synapse directed Plaintiff to complete formal accommodation paperwork and to provide medical documentation substantiating his disability.

41.     Plaintiff complied. He took the paperwork to his physician, who recommended that Plaintiff be permitted to work from home due to his worsening anxiety arising from the hostile work environment at Synapse. Plaintiff returned the completed accommodation paperwork to Mr. Brinkley in early January 2025.

42.     Mr. Brinkley never responded to, acknowledged, or otherwise engaged with Plaintiff's accommodation request. Synapse engaged in no interactive process whatsoever.

43.     Before submitting the paperwork, Plaintiff had emailed Mr. Brinkley several times asking why he was required to submit formal accommodation paperwork to work remotely when younger employees were not. Mr. Brinkley did not reply.

44.     Synapse permitted substantially younger employees to work from home without requiring any accommodation paperwork or medical documentation, including:

45.     Cem Sumerer (approximately 22–24 years old), who was permitted to work from home indefinitely due to anxiety without submitting any paperwork or request;

46.     Tim Dawley (approximately 33–35 years old), who was permitted to work from home indefinitely due to car issues simply by informing others of his need; and

47.     Anthony Burkhart (approximately 35–38 years old), who was permitted to work from home when sick and then to continue doing so for an extended period without obtaining additional clearances or filing accommodation paperwork.

48.     Plaintiff alone - the oldest of these employees and the only one who had engaged in protected activity - was subjected to heightened procedural requirements and then denied the accommodation altogether.

49.     On or about February 14, 2025 - just weeks after Plaintiff submitted his completed accommodation paperwork, and following his repeated complaints of discrimination and retaliation - Synapse terminated Plaintiff's employment.

50.     Throughout this period, Plaintiff repeatedly complained to Synapse's Chief Executive Officer, Bobby Deraco, that he was being retaliated against and subjected to unfair and discriminatory treatment. Mr. Deraco initially expressed concern and assured Plaintiff that he

8

would fix the situation, but never did. Instead, Synapse ignored five of Plaintiff's complaints and then admonished Plaintiff for "bothering" Mr. Deraco when Plaintiff followed up a sixth time.

51.    The reasons Synapse has offered for its adverse actions against Plaintiff are pretextual. The purported performance deficiencies were never documented before Plaintiff engaged in protected activity, were applied to Plaintiff but not to similarly situated younger employees, and shifted over time.

52.    The close temporal proximity between Plaintiff's protected activity - his internal complaint, his ongoing complaints of discrimination, and his accommodation request - and the adverse actions taken against him further evidences Synapse's retaliatory and discriminatory motive.

53.    As a direct and proximate result of Synapse's unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, lost earning capacity, lost commissions, emotional distress, anxiety, humiliation, and other harm.

## COUNT I
### Age Discrimination in Violation of the ADEA, 29 U.S.C. § 621, et seq.
### (Plaintiff v. Synapse Marketing Solutions)

54.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

55.    At all relevant times, Plaintiff was over forty (40) years of age and a member of the class protected by the ADEA.

56.    Plaintiff was qualified for his position and performed his job satisfactorily, as evidenced by Synapse's repeated praise of his work.

57.    Synapse subjected Plaintiff to adverse employment actions, including stripping him of his duties, demoting him, cutting his pay, changing his title, and terminating his employment, while reassigning his responsibilities to substantially younger employees.

58.    Synapse treated substantially younger, similarly situated employees more favorably than Plaintiff under circumstances giving rise to an inference of age discrimination.

59.    But for Plaintiff's age, Synapse would not have taken the adverse actions described herein. The reasons proffered by Synapse for its actions are pretextual.

60.    Synapse's conduct was willful, knowing, and in reckless disregard of Plaintiff's rights under the ADEA, entitling Plaintiff to liquidated damages.

61.    As a direct and proximate result of Synapse's violations of the ADEA, Plaintiff has suffered the damages described herein, for which he seeks all relief available under 29 U.S.C. § 626, including back pay, front pay, liquidated damages, prejudgment interest, and attorneys' fees and costs.

## COUNT II
**Retaliation in Violation of the ADEA, 29 U.S.C. § 621, et seq.**
**(Plaintiff v. Synapse Marketing Solutions)**

62.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

63.    Plaintiff engaged in protected activity under the ADEA when he repeatedly complained to Synapse's management that he was being subjected to age discrimination, including the reassignment of his duties to substantially younger employees.

64.    Synapse was aware of Plaintiff's protected activity.

65.    Following and because of Plaintiff's protected activity, Synapse subjected Plaintiff to materially adverse actions, including a PIP, demotion, pay reduction, title change, and termination.

66.    A causal connection exists between Plaintiff's protected activity and the adverse actions, as evidenced by, among other things, the close temporal proximity between them and Synapse's shifting and pretextual explanations.

67.    As a direct and proximate result of Synapse's retaliation in violation of the ADEA, Plaintiff has suffered the damages described herein, for which he seeks all relief available under 29 U.S.C. § 626.

### COUNT III
**Disability Discrimination in Violation of the ADA, 42 U.S.C. § 12101, et seq.**
**(Plaintiff v. Synapse Marketing Solutions)**

68.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

69.    Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff suffers from severe anxiety, a physical or mental impairment that substantially limits one or more major life activities, including the operation of major bodily functions. In the alternative, Synapse regarded Plaintiff as having such an impairment and/or Plaintiff has a record of such an impairment.

70.    At all relevant times, Plaintiff was able to perform the essential functions of his position, with or without a reasonable accommodation.

71.    Synapse, through its agents, was aware of Plaintiff's disability, including by virtue of Plaintiff's accommodation request and the supporting medical documentation he submitted.

11

72.     Synapse subjected Plaintiff to adverse employment actions, including demotion, pay reduction, denial of accommodation, and termination, because of his actual disability, his record of disability, and/or because Synapse regarded him as disabled.

73.     The reasons proffered by Synapse for its actions are pretextual.

74.     As a direct and proximate result of Synapse's violations of the ADA, Plaintiff has suffered the damages described herein, for which he seeks all relief available under 42 U.S.C. § 12117 and 42 U.S.C. § 1981a, including compensatory and punitive damages, back pay, front pay, and attorneys' fees and costs.

## COUNT IV
### Failure to Accommodate in Violation of the ADA, 42 U.S.C. § 12101, et seq.
### (Plaintiff v. Synapse Marketing Solutions)

75.     Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

76.     Plaintiff is a qualified individual with a disability who was able to perform the essential functions of his position with a reasonable accommodation.

77.     Plaintiff requested a reasonable accommodation - permission to work from home - and supported that request with documentation from his physician recommending remote work due to his anxiety.

78.     The accommodation Plaintiff requested was reasonable and would not have imposed an undue hardship on Synapse, as demonstrated by the fact that Synapse permitted numerous other employees to work remotely.

79.     Synapse failed to engage in the interactive process in good faith. Synapse never responded to, acknowledged, or acted upon Plaintiff's accommodation request, and instead terminated him shortly after he submitted his completed paperwork.

80.    As a direct and proximate result of Synapse's failure to accommodate in violation of the ADA, Plaintiff has suffered the damages described herein, for which he seeks all relief available under the ADA.

## COUNT V
### Retaliation in Violation of the ADA, 42 U.S.C. § 12101, et seq.
### (Plaintiff v. Synapse Marketing Solutions)

81.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

82.    Plaintiff engaged in protected activity under the ADA when he requested a reasonable accommodation for his disability and complained about Synapse's disparate treatment of him with respect to remote work.

83.    Synapse was aware of Plaintiff's protected activity.

84.    Following and because of Plaintiff's protected activity, Synapse subjected Plaintiff to materially adverse actions, culminating in his termination just weeks after he submitted his completed accommodation paperwork.

85.    A causal connection exists between Plaintiff's protected activity and the adverse actions, as evidenced by their close temporal proximity and Synapse's pretextual explanations.

86.    As a direct and proximate result of Synapse's retaliation in violation of the ADA, Plaintiff has suffered the damages described herein, for which he seeks all relief available under the ADA.

## COUNT VI
### Hostile Work Environment in Violation of the ADA and ADEA
### (Plaintiff v. Synapse Marketing Solutions)

87.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

13

88.     Plaintiff was subjected to harassment because of his age and his disability, and in retaliation for his protected activity, including constant surveillance, disparate and demeaning scheduling and work demands, baseless blame, and isolation from colleagues.

89.     The harassment was severe or pervasive enough to alter the terms and conditions of Plaintiff's employment and to create an abusive working environment, which both Plaintiff and a reasonable person in his position would find hostile.

90.     Synapse knew of the hostile work environment - indeed, it was cultivated by Synapse's own Chief Operating Officer and ignored by its Chief Executive Officer despite Plaintiff's repeated complaints - yet failed to take any remedial action. Respondeat superior liability attaches because the harasser was Plaintiff's supervisor and the harassment culminated in tangible employment actions.

91.     As a direct and proximate result of the hostile work environment, Plaintiff has suffered the damages described herein.

**<u>COUNT VII</u>**
**Violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq.**
**(Plaintiff v. Synapse Marketing Solutions)**

92.     Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

93.     At all relevant times, Synapse was an "employer" within the meaning of the PHRA, and Plaintiff was an "employee" protected by the PHRA.

94.     Plaintiff dual-filed his Charge with the PHRC, and more than one year has elapsed since that filing. Plaintiff has therefore exhausted his administrative remedies under the PHRA.

95.     The PHRA prohibits the same conduct prohibited by the ADEA and the ADA, and PHRA claims are generally analyzed coextensively with their federal counterparts. By engaging in the conduct described above - age discrimination, disability discrimination, failure to accommodate, retaliation, and the maintenance of a hostile work environment - Synapse violated the PHRA.

96.     Plaintiff's PHRA claims are based on the same factual averments that support his ADEA and ADA claims, and are asserted on the same factual predicate.

97.     As a direct and proximate result of Synapse's violations of the PHRA, Plaintiff has suffered the damages described herein, for which he seeks all relief available under the PHRA, including compensatory damages and attorneys' fees and costs.

## COUNT VIII
### Violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.*
### (Plaintiff v. Synapse Marketing Solutions)

98.     Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

99.     At all relevant times, Synapse was an "employer" within the meaning of the WPCL, and Plaintiff was an "employee" to whom wages were due.

100.    To induce Plaintiff to leave his own marketing agency and accept employment with Synapse, Synapse promised Plaintiff commissions of up to $100,000, to be earned on business that Plaintiff brought to or generated for Synapse.

101.    In reliance on that promise, Plaintiff accepted employment with Synapse and brought two of his existing clients to Synapse, together worth approximately $110,000 in annual revenue.

102.    The commissions promised to Plaintiff constitute "wages" within the meaning of the WPCL, 43 P.S. § 260.2a, which defines wages to include fringe benefits and other compensation earned, including commissions.

103.    Plaintiff earned commissions under Synapse's compensation arrangement, but Synapse paid Plaintiff only approximately $6,000 in commissions over the course of nine months - and even then only after Plaintiff was required to fight for payment - despite Synapse's receipt of the benefit of the client relationships and revenue Plaintiff generated.

104.    The WPCL requires an employer to pay wages due on regular paydays designated in advance, and to pay all wages and compensation earned no later than the time set forth in the parties' agreement. 43 P.S. § 260.3.

105.    Synapse failed to pay Plaintiff the commissions he earned within the time required by the WPCL, and has continued to fail to pay those wages.

106.    Synapse's failure to pay the wages owed was not the result of a good-faith dispute. Plaintiff is therefore entitled to liquidated damages in an amount equal to twenty-five percent (25%) of the total wages due, or $500, whichever is greater, pursuant to 43 P.S. § 260.10.

107.    The WPCL further entitles Plaintiff to recover the wages owed, liquidated damages, and reasonable attorneys' fees and costs of suit. 43 P.S. § 260.9a(f).

108.    As a direct and proximate result of Synapse's violations of the WPCL, Plaintiff has suffered damages in the form of unpaid commissions, plus liquidated damages, interest, and attorneys' fees and costs.

**COUNT IX**
**Breach of Contract**
**(Plaintiff v. Synapse Marketing Solutions)**

109.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

110.    To induce Plaintiff to leave his own marketing agency and accept employment with Synapse, Synapse made specific promises to Plaintiff, including that he would receive a salary of $130,000 per year, commissions of up to $100,000 to be earned on business that Plaintiff brought to or generated for Synapse, and his own office.

111.    Plaintiff accepted Synapse's offer and performed his obligations under the agreement, including leaving his own agency, joining Synapse, and bringing two of his existing clients - together worth approximately $110,000 in annual revenue - to Synapse

112.    A valid and enforceable contract existed between Plaintiff and Synapse with respect to Plaintiff's compensation, supported by consideration.

113.    Synapse breached the agreement by failing to pay Plaintiff the commissions he earned, having paid Plaintiff only approximately $6,000 in commissions over nine months despite Synapse's receipt of the benefit of the client relationships and revenue Plaintiff generated, and by failing to provide other promised terms of his employment.

114.    As a direct and proximate result of Synapse's breach, Plaintiff has suffered damages, including unpaid commissions and other compensation owed, in an amount to be determined at trial.

**COUNT X**
**Promissory Estoppel**
**(Plaintiff v. Synapse Marketing Solutions)**
**(Pleaded in the Alternative to Count IX)**

115.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

116.    To the extent the promises Synapse made to Plaintiff are determined not to constitute an enforceable contract, Plaintiff pleads in the alternative that Synapse made those promises - including the promise of commissions of up to $100,000 and other compensation -

17

under circumstances in which Synapse reasonably should have expected the promises to induce action on the part of Plaintiff.

117. Synapse's promises did in fact induce Plaintiff to act to his detriment. In reasonable reliance on Synapse's promises, Plaintiff left the marketing agency he had owned and operated for approximately three years and brought two of his existing clients to Synapse.

118. Plaintiff's reliance on Synapse's promises was reasonable and foreseeable.

119. Injustice can be avoided only by enforcing Synapse's promises, as Plaintiff surrendered his own business and client relationships in reliance on those promises and received only a fraction of the compensation he was promised.

120. As a direct and proximate result of Plaintiff's detrimental reliance on Synapse's promises, Plaintiff has suffered damages in an amount to be determined at trial.

**COUNT XI**
**Unjust Enrichment**
**(Plaintiff v. Synapse Marketing Solutions)**
**(Pleaded in the Alternative to Counts IX and X)**

121. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

122. To the extent no enforceable express contract is found to govern Plaintiff's compensation, Plaintiff pleads in the alternative that he conferred a benefit upon Synapse by bringing two of his existing clients - together worth approximately $110,000 in annual revenue - to Synapse, and by generating business and revenue for Synapse.

123. Synapse appreciated and accepted the benefit conferred by Plaintiff, including the client relationships and the revenue derived from them.

124. Synapse accepted and retained the benefit conferred by Plaintiff under circumstances in which it would be inequitable for Synapse to retain that benefit without

18

payment of its value, having failed to pay Plaintiff the commissions and compensation he was promised and earned.

125.    As a direct and proximate result of Synapse's unjust retention of the benefit Plaintiff conferred, Plaintiff has suffered damages in an amount to be determined at trial, and Synapse is liable to Plaintiff in the amount by which it has been unjustly enriched.

126.    As a direct and proximate result of Synapse's unjust retention of the benefit Plaintiff conferred, Plaintiff has suffered damages in an amount to be determined at trial, and Synapse is liable to Plaintiff in the amount by which it has been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Anthony Gaenzle respectfully requests that this Court enter judgment in his favor and against Defendant Synapse Marketing Solutions, and grant the following relief:

a.      Declaring that the acts and practices complained of herein violate the ADEA, the ADA, WPCL, Pennsylvania common law and the PHRA;

b.      Enjoining Defendant from engaging in the unlawful practices alleged herein;

c.      Awarding Plaintiff back pay, front pay, lost benefits, lost commissions, and lost earning capacity, in amounts to be determined at trial;

d.      Awarding Plaintiff compensatory damages, including damages for emotional distress, anxiety, humiliation, and loss of life's enjoyment, under the ADA and the PHRA;

e.      Awarding Plaintiff liquidated damages under the ADEA for Defendant's willful violations;

f.      Awarding Plaintiff punitive damages under the ADA;

19

g.      Awarding Plaintiff prejudgment and post-judgment interest;

h.      Awarding Plaintiff the costs of suit, expert fees, and reasonable attorneys' fees; and

i.      Granting such other and further relief as this Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**THE LACY EMPLOYMENT LAW FIRM, LLC**

*/s/ Andrew Lacy, Jr.*
Andrew Lacy, Jr., Esq.
Austin D. Skelton, Esq.
Richard Haarbauer, Esq.
3675 Market Street, Suite 200
Philadelphia, PA 19104
(t) 412-301-3908
andrew.lacy@lacylegal.com
austin.skelton@lacylegal.com
rickhaarbauer@lacylegal.com
Counsel for Plaintiff

Dated: July 2, 2026

# EXHIBIT 1

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Philadelphia District Office**
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/22/2026

**To:** Anthony Gaenzle
383 Cobblestone Lane
Lancaster, PA 17601
**Re**: Anthony Gaenzle v. Synapse Marketing Solutions
Charge No: 530-2025-04052

EEOC Representative and contact number:

Legal Unit
267-589-9707

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 530-2025-04052.

On behalf of the Commission,

Digitally Signed By:Karen McDonough
05/22/2026
Karen McDonough
Deputy Director

**Cc:**
NA NA
2950 Old Tree Lane
Lancaster, PA 17601

Renee Harris
Ward Law, LLC
1617 JFK Blvd Suite 500
Philadelphia, PA 19103

Brian Brinkley
2950 Old Tree Lane
Lancaster, PA 17601

Alyssa Wilson
Ward Law, LLC
1617 JFK Blvd
Philadelphia, PA 19103

Andrew Lacy
The Lacy Employment Law Firm, LLC.
3675 Market Street, Suite 200
Philadelphia, PA 19104


Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

#### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

#### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

#### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 530-2025-04052 to the District Director at Karen McDonough, 801 Market St Suite 1000, Philadelphia, PA 19107.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 530-2025-04052 to the District Director at Karen McDonough, 801 Market St Suite 1000, Philadelphia, PA 19107.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

Enclosure with EEOC Notice of Closure and Rights (05/25)

**are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.